UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DOUGLAS J.[1], | ) |
|        Plaintiff, | ) |
| v. | ) No. 1:20-cv-03023-DLP-JPH |
| KILOLO KIJAKAZI, | ) |
|        Defendant. | ) |

## ORDER

Plaintiff Douglas J. requests judicial review of the denial by the Commissioner of the Social Security Administration ("Commissioner") of his application for Social Security Disability Insurance Benefits ("DIB") under Title II and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. *See* 42 U.S.C. §§ 405(g), 423(d). For the reasons set forth below, the Court hereby **AFFIRMS** the ALJ's decision denying the Plaintiff benefits.

### I.  PROCEDURAL HISTORY

On June 14, 2018, Douglas filed his application for Title II DIB and Title XVI SSI benefits. (Dkt. 16-2 at 16, R. 15). Douglas alleged disability resulting from a car accident that left him with no left clavicle movement and 25% or more loss of left shoulder movement. (Dkt. 16-4 at 2-3, R. 78-79). The Social Security Administration

---

[1] In an effort to protect the privacy interests of claimants for Social Security benefits, the Southern District of Indiana has adopted the recommendations put forth by the Court Administration and Case Management Committee of the Administrative Office of the United States Courts regarding the practice of using only the first name and last initial of any non-government parties in Social Security opinions. The Undersigned has elected to implement that practice in this Order.

1

("SSA") denied Douglas's claims initially on October 11, 2018, (Dkt. 16-4 at 2-21, R. 78-97), and on reconsideration on March 13, 2019, (Dkt. 16-4 at 22-53, R. 98-129). On April 26, 2019, Douglas filed a written request for a hearing, which was granted. (Dkt. 16-5 at 27-28, R. 155-56).

On February 5, 2020, Administrative Law Judge ("ALJ") Latanya White Richards conducted a hearing, where Douglas appeared in person and vocational expert, Mary Everts, appeared by phone, respectively. (Dkt. 16-3 at 4, R. 33). On February 20, 2020, ALJ White Richards issued an unfavorable decision finding that Douglas was not disabled. (Dkt. 16-2 at 16-26, R. 15-25). Douglas appealed the ALJ's decision and, on September 23, 2020, the Appeals Council denied Douglas's request for review, making the ALJ's decision final. (Dkt. 16-2 at 2, R. 1). Douglas now seeks judicial review of the ALJ's decision denying benefits pursuant to 42 U.S.C. § 1383(c)(3).

## II.   STANDARD OF REVIEW

Under the Act, a claimant may be entitled to DIB and SSI only after he establishes that he is disabled. To prove disability, a claimant must show he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). To meet this definition, a claimant's impairments must be of such severity that he is not able to perform the work he previously engaged in and, based on his age, education, and work

2

experience, he cannot engage in any other kind of substantial gainful work that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A).

The SSA has implemented these statutory standards by, in part, prescribing a five-step sequential evaluation process for determining disability. 20 C.F.R. § 404.1520(a).[2] The ALJ must consider whether:

> (1) the claimant is presently [un]employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005) (citation omitted). An affirmative answer to each step leads either to the next step or, at steps three and five, to a finding that the claimant is disabled. 20 C.F.R. § 404.1520; *Briscoe*, 425 F.3d at 352. If a claimant satisfies steps one and two, but not three, then he must satisfy step four. Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995); *see also* 20 C.F.R. § 404.1520 (a negative answer at any point, other than step three, terminates the inquiry and leads to a determination that the claimant is not disabled).

---

[2] The Code of Federal Regulations contains separate, parallel sections pertaining to disability benefits under the different titles of the Social Security Act. The parallel sections – applying to disability insurance benefits and supplemental security income benefits – are verbatim and make no substantive legal distinction based on the benefit type.

After step three, but before step four, the ALJ must determine a claimant's residual functional capacity ("RFC") by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). The RFC is an assessment of what a claimant can do despite his limitations. *Young v. Barnhart*, 362 F.3d 995, 1000-01 (7th Cir. 2004). In making this assessment, the ALJ must consider all the relevant evidence in the record. *Id.* at 1001. The ALJ uses the RFC at step four to determine whether the claimant can perform his own past relevant work and if not, at step five to determine whether the claimant can perform other work in the national economy. *See* 20 C.F.R. § 404.1520(a)(4)(iv)-(v).

The claimant bears the burden of proof through step four. *Briscoe*, 425 F.3d at 352. If the first four steps are met, the burden shifts to the Commissioner at step five. *Id.* The Commissioner must then establish that the claimant – in light of his age, education, job experience, and residual functional capacity to work – is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f).

Judicial review of the Commissioner's denial of benefits is to determine whether it was supported by substantial evidence or is the result of an error of law. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). This review is limited to determining whether the ALJ's decision adequately discusses the issues and is based on substantial evidence. Substantial evidence "means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a


conclusion." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). The standard demands more than a scintilla of evidentiary support but does not demand a preponderance of the evidence. *Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001). Thus, the issue before the Court is not whether Douglas is disabled, but, rather, whether the ALJ's findings were supported by substantial evidence. *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).

Under this administrative law substantial evidence standard, the Court reviews the ALJ's decision to determine if there is a logical and accurate bridge between the evidence and the conclusion. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (citing *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). In this substantial evidence determination, the Court must consider the entire administrative record but not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Nevertheless, the Court must conduct a critical review of the evidence before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *see also Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

When an ALJ denies benefits, she must build an "accurate and logical bridge from the evidence to h[er] conclusion," *Clifford*, 227 F.3d at 872, articulating a minimal, but legitimate, justification for the decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). The

ALJ need not address every piece of evidence in her decision, but she cannot ignore a line of evidence that undermines the conclusions she made, and she must trace the path of her reasoning and connect the evidence to her findings and conclusions. *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *Clifford*, 227 F.3d at 872.

### III.  BACKGROUND

#### A. Factual Background

Douglas was forty-six years old as of his alleged onset date of February 14, 2018. (Dkt. 16-4 at 2, R. 78). He is a high school graduate. (Dkt. 16-7 at 16, R. 250). He has past relevant work history as a supervisor, manager, and team lead in various construction, automotive, and manufacturing industries. (Dkt. 16-7 at 16-17, R. 250-51).

#### B. ALJ Decision

In determining whether Douglas qualified for benefits under the Act, the ALJ employed the five-step sequential evaluation process set forth in 20 C.F.R. §§ 404.1520(a) and 416.920(a) and concluded that Douglas was not disabled. (Dkt. 16-2 at 16-26, R. 15-25). At Step One, the ALJ found that Douglas had not engaged in substantial gainful activity since his alleged onset date of February 14, 2018. (Id. at 18, R. 17).

At Step Two, the ALJ found that Douglas has severe impairments of bilateral carpal tunnel syndrome, cervical spine disorder status post discectomy and fusion, diabetes mellitus with neuropathy, degenerative joint disease of the right hand,

status post left clavicle resection, and bilateral thumb pain with synovitis/early arthritis. (Dkt. 16-2 at 19, R. 18).

At Step Three, the ALJ found that Douglas's impairments or combination of impairments did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. § 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926. (Dkt. 16-2 at 19, R. 18). In reaching this determination, the ALJ considered Listing 1.02 for major dysfunction of a joint, Listing 1.04 for disorders of the spine, and SSR 14-2p, in conjunction with Listings 1.00, 2.00, 4.00, 5.00, 6.00, 8.00, 11.00, and 12.00, for diabetes mellitus. (Dkt. 16-2 at 19, R. 18).

After Step Three but before Step Four, the ALJ found that Douglas had the residual functional capacity ("RFC") to perform "light work, " as defined in 20 C.F.R. § 404.1567(b) and 416.967(b), with the following exertional limitations: occasionally climbing ramps and stairs; no climbing of ladders, ropes, or scaffolds; occasional stooping, kneeling, crouching, and crawling; occasional reaching overhead with the left upper extremity, but frequently reaching in all other directions with the left upper extremity; frequently bilaterally fingering and handling; and no exposure to extreme cold, unprotected heights, and hazardous machinery. (Dkt. 16-2 at 19-24, R. 18-23).

At Step Four, the ALJ concluded that Douglas is unable to perform any past relevant work. (Dkt. 16-2 at 24, R. 23).

At Step Five, relying on the vocational expert's testimony, the ALJ determined that, considering Douglas's age, education, work experience, and

7

residual functional capacity, he was capable of performing jobs in the national economy. (Dkt. 16-2 at 25-26, R. 24-25). The ALJ thus concluded that Douglas was not disabled. (Id. at 26, R. 25).

## IV.   ANALYSIS

In support of his request for reversal of the ALJ's decision, Douglas raises two claims of error. First, Douglas claims that the ALJ failed to properly account for his need to miss work in the RFC assessment. Second, Douglas maintains the ALJ failed to adequately explain her reason for finding that Douglas could perform work in the national economy in light of the VE's testimony regarding absenteeism during a job's probationary period. The Court will consider these arguments in turn.

At the outset, the Court notes that many of the Plaintiff's arguments for remand are both undeveloped and unclear. It is not for this Court to develop the Plaintiff's arguments or comb through the record to find support. *See Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 704 (7th Cir. 2010) (explaining that it is not the court's "responsibility to research and construct the parties' arguments") (internal quotations omitted). Accordingly, the Court will address only the specific issues raised in the Plaintiff's opening brief and will not speculate as to possible arguments the Plaintiff was attempting to make. *See Olsen v. Colvin*, 551 F. App'x 868, 875 (7th Cir. 2014) (noting that the claimant has the "burden to show that the ALJ's decision is not supported by substantial evidence.").

### A. Need to Miss Work to Attend Medical Visits

First, Douglas appears to argue that the ALJ erred by failing to address a line of evidence demonstrating that he would be incapable of sustaining work in the RFC assessment. (Dkt. 18 at 10). To support this contention, Douglas cites to 70 medical visits or procedures that he participated in from February 14, 2018 through December 19, 2019. (Dkt. 18 at 12; Dkt. 21 at 2-4). In response, the Commissioner argues that Douglas's pattern of acquiring treatment in the past, does not conclusively show that Douglas's current medical visits would preclude work. (Dkt. 19 at 5-8).

The RFC is an assessment of "the claimant's ability to do physical and mental work activities on a regular and continuing basis despite limitations from [his] impairments." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014); *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004) (RFC is a measure of what an individual can do despite the limitations imposed by his impairments). "A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *1. Repeated absences from work for medical reasons could disqualify a person from sustaining gainful employment on a continuing basis. *Voigt v. Colvin*, 781 F.3d 871, 874 (7th Cir. 2015). Thus, "an ALJ may be obligated to address a claimant's ability to sustain work if the claimant presents sufficient evidence demonstrating that the ability would be precluded by treatment visits which are necessitated by the claimant's impairments." *Karen A. R. v. Saul*, No. 1:18-cv-02024-DLP-SEB, 2019 WL 3369283, at *4 (S.D. Ind. July 26,

2019) (citing *Gary B. v. Berryhill*, No. 1:18-cv-00833-JMS-TAB, 2018 WL 4907495, at *4 (S.D. Ind. Oct. 10, 2018)); *Weaver v. Berryhill*, 746 F. App'x 574, 579 (7th Cir. 2018) (the claimant bears the burden of providing evidence supporting "specific limitations affecting [his] capacity to work"). The RFC is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities. SSR 96-8p, 1996 WL 374184, at *3. Because the restrictions on a claimant's ability to sustain full-time work, due to the frequency of medical visits, falls within the RFC analysis, it is the Plaintiff's burden to provide evidence to support this specific limitation. *Chestine G. v. Saul*, Case No. 18 C 4980, 2020 WL 1157384 (N.D. Ill. March 10, 2020).

Here, the ALJ assessed that Douglas has the residual functional capacity to perform light work, with certain exertional limitations. (Dkt. 16-2 at 19-24, R. 18-23). The ALJ declined to include limitations about missing work in the RFC. (Id.). Contrary to Plaintiff's argument, this omission was supported by substantial evidence.

By simply pointing to over seventy doctors' visits between February 14, 2018 and December 19, 2019, Douglas fails to demonstrate that his ability to sustain work is precluded by his treatment visits. Douglas failed to present any evidence that these 70 visits were needed on an emergency or unpredictable basis, that these appointments lasted for a significant length of time, or that these medical treatments could not be scheduled around a full-time work schedule. *See, e.g.*, *Chestine G.*, 2020 WL 1157384, at *10 (finding claimant did not meet burden where

she made no effort to explain how long appointments lasted or even whether they could occur during hours when she would be working); *Karen A. R.*, 2019 WL 3369283, at *4 (finding claimant did not meet burden where the list of visits the claimant provided showed treatment approximately 1-4 times per month, and all visits lasted under an hour); *Danielle H. v. Berryhill*, No. 1:18-cv-02990-JPH-TAB, 2019 WL 1614640, at *4 (S.D. Ind. Apr. 15, 2019) (finding claimant did not present enough evidence to establish that she was unable to sustain work due to medical appointments where there was no evidence the treatment was needed on an emergency or unpredictable basis or could not be scheduled around a full-time work schedule, and the visits often lasted under an hour); *Gary B.*, 2018 WL 4907495, at *5 (claimant failed to present sufficient evidence that he was unable to sustain work, in part because he received rather standard treatment, the frequency of the visits did not appear work preclusive, nor was there evidence that the length of the visits would make them difficult to schedule around a full-time work schedule).

In this case, the substantive evidence, which the ALJ extensively discussed in her opinion, does not indicate a need for emergency, unscheduled treatment or frequent treatment that would interfere with a full-time work schedule. The evidence of record demonstrates continued improvements in Douglas's impairments; regular and predictable primary care and physical therapy appointments; and overall short appointment times. (Dkt. 16-9 at 108-10, 195-98, 336-37, 342-88, R. 783-85, 870-73, 1011-12, 1017-63; Dkt.16-10 at 4-5, 10-15, 33-47, 55-56, R. 1066-67, 1072-77, 1095-1109, 1117-18).

Moreover, the ALJ acknowledging the opinions of Douglas's treating orthopedist, Dr. Michael DiDonna, and his cervical spine surgeon, Dr. Flynn Rowan, found them to be unpersuasive. On June 17, 2019, Dr. DiDonna completed a medical statement questionnaire opining that Douglas would be absent from work as a result of his impairments or treatment approximately two to three days per month and would be off task 25% to 50% of the workday. (Dkt. 16-2 at 23, R. 22; Dkt. 16-9 at 340, R. 1015). When asked to explain the findings supporting his opinion, Dr. DiDonna left that portion of the questionnaire blank. (Dkt. 16-9 at 341, R. 1016). The ALJ concluded that Dr. DiDonna's opinion, as a whole, was inconsistent with Douglas's treatment history. (Dkt. 16-2 at 23, R. 22).

On January 17, 2020, Dr. Rowan completed a medical statement for Douglas opining that Douglas would be off task 40% of the workday due to pain, and would be absent from work more than four days per month as a result of his impairments or treatment. (Dkt. 16-2 at 23, R. 22; Dkt. 16-10 at 71-72, R. 1133-34). The ALJ likewise found Dr. Rowan's opinion unpersuasive. (Dkt. 16-2 at 23, R. 22). The ALJ reasoned that while the limitations Dr. Rowan found appeared to be primarily supported by Douglas's subjective complaints of neck and shoulder pain, the limitations were unsupported by Dr. Rowan's own treatment notes, which revealed satisfactory functionality following the cervical surgery. (Id.). Notably, Douglas does not contest the ALJ's decision to discount these opinions.

Douglas has not presented sufficient evidence demonstrating that his need to miss work for medical treatment would preclude his ability to sustain work. In

reviewing the ALJ's decision, the Undersigned finds the ALJ's decision not to include an absenteeism limitation in the RFC is supported by substantial evidence. Accordingly, remand is not warranted on this issue.

## B. Probationary Period

Douglas next argues that the ALJ failed to reconcile Douglas's treatment history with the VE's testimony regarding an employer's intolerance for missing work during a probationary period. (Dkts. 18 at 10-11, 21 at 4). Here, Plaintiff seems to suggest that his treatment history, approximately 70 medical appointments in 22 months, demonstrated a need for him to have to miss work on average three times per month. (Dkt. 18 at 12). This limitation, Douglas maintains, should have been addressed by the ALJ when finding that he could perform work in the national economy at Step 5. The Commissioner responds that Douglas's contentions are unavailing because there is no evidence that the jobs the ALJ cited at Step 5 require a probationary period that would prohibit all absences. (Dkt. 19 at 8-10). In reply, Douglas maintains that the ALJ had a duty to obtain evidence that the jobs identified by the VE would allow him to miss work during the probationary period, and there were a significant number of such jobs. (Dkt. 21 at 6).

At Step 5 of the sequential process for determining disability, the Commissioner bears the burden to establish that the claimant can, considering his RFC, age, education, and work experience, perform other work that exists in significant numbers in the national economy. 20 C.F.R. § 404.1560(c)(2); see *Britton v. Astrue*, 521 F.3d 799, 803 (7th Cir. 2008). For this fifth and final step in the

13

analysis, ALJs generally rely on the Dictionary of Occupational Titles for information about the typical characteristics of jobs as they exist in the economy, and ALJs are required to take administrative notice of job information in various publications, including the DOT. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011). ALJs also often rely on vocational experts – professionals under contract with SSA to provide impartial testimony in agency proceedings – to "supplement the information provided in the DOT by providing an impartial assessment of the types of occupations in which claimants can work and the availability of positions in such occupations." *Id.; see also, Brace v. Saul*, 970 F.3d 818, 820 (7th Cir. 2020).

In this case, based on the testimony of the vocational expert, the ALJ determined at Step 4 that Douglas could not perform any of his past relevant work. The burden was then on the Social Security Administration to show whether there were nonetheless a significant number of other jobs in the national economy that Douglas could perform. *See* 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f). The VE testified that there were 70,000 inspector packer jobs, 40,000 sorter jobs, and 300,000 assembler jobs in the national economy that Douglas could perform.[3] (Dkt. 16-3 at 34-35, R. 63-64). On cross, Douglas's qualified representative, Ms. Laura Siener[4], questioned the VE regarding an employer's tolerance for missed work. (Dkt. 16-3 at 39-41, R. 68-70).

---

[3] The VE calculated her estimates as to the number of jobs in the national economy that a hypothetical individual could perform with the same assumed limitations as Douglas. (Dkt. 16-3 at 34-35, R. 63-64).

[4] The Appointment of Representative Form Douglas completed indicates that Ms. Siener is a "non-attorney eligible for direct payment under SSA law." (Dkt. 16-5 at 29, R. 157). The hearing transcript refers to Ms. Siener as Plaintiff's attorney, however, it appears she is a non-attorney.

Q: …[W]hat is the tolerance for missed days of work per month?
VE: Generally, I believe that employers will allow one unexcused absence per month after the probationary period. That would include coming in late and leaving early. But for those employers that do implement a probationary period, many do not allow absences during that period of time.
Q: Okay. And what's an employer's tolerance for doctors' appointments, physical therapy appointments if they're going anywhere from two to four times a week?
VE: Well, generally, individuals would be using their earned time off. So they're going to use their sick time, their vacation time for that and if they get to a point that they run out of leave time, it's going to definitely be problematic.
Q: Okay. So if a doctor's appointment and physical therapy appointments last and you're going anywhere from two to four times a week and it's lasting at least an hour-and-a-half with drive time and…I want to be sure…that an employer is going to tolerate that…even if you're using sick or personal.
ALJ: …we are assuming that all appointments are during – will be during work hours.
Q: Correct.
....
ALJ: So it sounds like your question is as to absences. She just spoke about being absent, leaving work early, getting there late. So, are you asking if someone had to be absent, leave work early or get to work late a certain amount of days a week, what the effect would be? ….
Q: Yeah, that's correct. Yes.
ALJ Okay. So you're saying if someone is going to be absent, had to leave early or get to work late how many days a week?
Q: Anywhere from two to four, Your Honor.
VE: So, my testimony is that employers will generally allow one unexcused absence per month after the probationary period and that many employers do not allow any absences during the probationary period. For those individuals that do have paid time off, they may be using that paid time off for their appointments and in general, though, I go back to what I said initially, employers generally allow one absence per month. So they may allow someone to use their time off for a designated period of time if they have a lot of appointments for an illness, but if they're consistently being absent for appointments for an ongoing indefinite period of time, they've used up all of their sick leave and their vacation time, that as I mentioned the first time, that's going to be problematic.

15

      Q:    Okay.
      VE:   and most likely would result in termination.

(Dkt. 16-3 at 39-41, R. 68-70).

    At Step 5, it was the Commissioner's burden to show that Douglas could do the jobs identified by the VE. After the issues of a probationary period were raised by Douglas, the Commissioner failed to explore this with the VE to determine if this changed the hypothetical claimant's ability to perform the identified jobs. Citing to the VE's testimony regarding the probationary period and his need to be absent at least three times per month for medical treatment, Douglas seems to argue that the ALJ's failure to address this line of evidence at Step 5 warrants remand. This argument is unavailing.

    As noted above, substantial evidence supported the ALJ's decision not to include a limitation for missed days in Douglas's RFC. Thus, even if the jobs identified by the VE required probationary or learning periods, this did not preclude Douglas from performing these jobs in the national economy. *See Jeffrey J. W. v. Comm'r of Soc. Sec.*, No. 3:20-cv-00077-GCS, 2020 WL 6482750, at *5 (S.D. Ill. Nov. 4, 2020) (internal quotations omitted). Having found that inclusion of days off work was not warranted in the RFC, the ALJ did not err in failing to evaluate further at the hearing or in her Step 5 analysis. *See Shelton v. Colvin*, No. 1:14-cv-01920-SEB-TAB, 2015 WL 13739358, at *3 (S.D. Ind. Oct. 13, 2015) (finding error when ALJ's RFC assessment limited the claimant from having more than brief, superficial interaction with co-workers, supervisors, and the general public, yet the jobs the VE identified for the claimant required a worker to go through a probationary period

16

during which he had to have more than brief, superficial interaction with supervisors and co-workers); *Dross-Swart v. Astrue*, 872 F. Supp. 2d 780, 800 (N.D. Ind. 2012) (ALJ has an affirmative duty to resolve apparent conflicts between her RFC finding and the DOT descriptions). Because there was nothing in the RFC determination that would have limited Douglas's ability to complete a probationary period, any error is harmless, and thus remand is not warranted.

### V. CONCLUSION

For the reasons detailed herein, the Court **AFFIRMS** the ALJ's decision denying the Plaintiff benefits. Final judgment will issue accordingly.

So ORDERED.

Date: 3/11/2022

*Doris L. Pryor*
Doris L. Pryor
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email